**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

DOROTHY TULEY, individually and as
Special Administrator of the Estate of Noah
Tuley, Deceased,

    Plaintiff,

v.

SMITHKLINE BEECHAM CORP., d/b/a
GLAXOSMITHKLINE, INC.,

    Defendant.

Case No.

```
FILED: APRIL 8, 2008
08CV1983          TG
JUDGE NORDBERG
MAGISTRATE JUDGE COLE
```

## NOTICE OF REMOVAL

        PLEASE TAKE NOTICE that pursuant to 28 U.S.C. § 1441 and 1446, Defendant,

SmithKline Beecham Corp., d/b/a GlaxoSmithKline ("GSK"), hereby gives notice of removal of

the above-captioned action, pending in the Circuit Court of Cook County, State of Illinois, Civil

Action No. 08-L-001850, to the United States District Court for the Northern District of Illinois,

Eastern Division.  In support of removal, GSK states as follows:

        1.      This Notice of Removal is timely pursuant to 28 U.S.C. § 1446(b) being filed

within thirty (30) days of the defendant being served with the Complaint.  A Notice of Removal

is timely if it is "filed within thirty days after the receipt by the defendant, through service or

otherwise, of a copy of the initial pleading…"  28 U.S.C. § 1446(b).

        2.      The Circuit Court of Cook County is located within the Northern District of

Illinois, Eastern Division.

        3.      On March 12, 2008, GSK was served with the Complaint.

1

4.      Pursuant to 28 U.S.C. § 1446(a), a copy of all process and pleadings served upon GSK are annexed hereto as Exhibit "A".  No orders have been served upon GSK as of the date of this filing.

## THIS COURT HAS DIVERSITY JURISDICTION

5.      This Court has original jurisdiction of this action under 28 U.S.C. § 1332, and therefore, this action is removable to this Court pursuant to 28 U.S.C. § 1441.  Section 1332 provides that the "district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between (1) citizens of different States…"

6.      The parties in this action are completely diverse.  In a wrongful death action, the citizenship of the decedent is determinative of plaintiff's citizenship.  *See* 28 U.S.C. 1332(c)(2)(providing that "the legal representative of the estate of a decedent shall be deemed to be a citizen only of the same State of the decedent…"); *see also Tropp v. Western-Southern Life Ins. Co.*, No. 02 C 8341, 2003 WL 21688245, at *1 n.3 ( N.D.Ill., July 18, 2003)(same), citing *Milam v. State Farm Mut. Auto. Ins. Co.*, 972 F.2d 166, 168 (7th Cir. 1992).

7.      In this case, Plaintiff affirmatively alleged in her complaint that the decedent, Noah Tuley, "was at the time of his death, an adult male resident citizen of Cook County, Illinois."  *See* Ex. A at 2 ¶3.

8.      Although Plaintiff's allegation of citizenship is conclusive, the decedent's death certificate is attached and annexed hereto as Exhibit "B".  The death certificate was issued by the State of Illinois.  The certificate confirms that the decedent resided at 14229 Cleveland in Posen, Illinois at the time of his death.  The certificate also provides that his spouse resided at the same location.  These facts are additional evidence that decedent was domiciled in Illinois.  *See*

*Gravadahl v. Conwell*, No. 00 C 0579, 2002 WL 398599 (N.D. Ill., Mar. 14, 2002)(holding that

evidence of family ties to a state is one factor which shows plaintiff is domiciled in a state).

9.      The defendant is not a citizen of Illinois.  Defendant GSK is a Pennsylvania

corporation with its principal place of business in Pennsylvania.  *See* Affidavit of Joshua E.

Johnson, annexed hereto as Exhibit "C".

10.      These facts clearly establish that decedent was a citizen of the State of Illinois and

that Defendant is a citizen of the State of Pennsylvania, and therefore, complete diversity exists.

11.      Section 1332 also requires that the amount in controversy exceed $75,000.  All

that is required to be shown is a "reasonable probability" that more than the jurisdictional

amount is in controversy.  *Shaw v. Dow Brands*, 994 F.3d 364, 366 (7th Cir. 1993).

12.      Plaintiff alleges the product Avandia caused Mr. Tuley's death. "If a plaintiff

alleges severe and permanent injuries and seeks damages for lost income, a defendant is on

notice that the case is removable and should remove the case within thirty days of receipt of the

complaint." *Marrs v. Quickway Carriers, Inc.*, 2006 WL 2494746, *3 (N.D. Ill., Aug. 23, 2006).

13.      Damages available under the Illinois Wrongful Death Act and Survival Act

include, but are not limited to, damages for medical care and treatment of the decedent, pain and

suffering of the decedent, pecuniary loss, and loss of society.  *See Estate of Barry v. Owens-*

*Corning Fiberglass*, 1994 WL 373403 (Ill. Cir.) (jury award of $12,319,620 for wrongful death

products liability action); *Jackson v. Hoffman Air & Filtration Systems Division of Clarkson*

*Industries*, 1986 WL 312223 (Ill. Cir.) (jury award of $3,000,000 for wrongful death products

liability action).

14.      GSK respectfully submits that the amount in controversy exceeds the

jurisdictional amount.

15.    Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being filed with the Circuit Court of Cook County, State of Illinois.

16.    By filing this notice, Defendant does not waive any available defenses.

## CONCLUSION

For the foregoing reasons, this Court has jurisdiction over this action pursuant to 28 U.S.C. §1332, and this action is properly removed pursuant to 28 U.S.C. §§ 1441 and 1446.


Dated: April 8, 2008

<div style="margin-left: 40%;">

Respectfully submitted,

SMITHKLINE BEECHAM CORP., d/b/a
GLAXOSMITHKLINE


By:  s/Eric F. Quandt_____
    One of Its Attorneys

</div>

Eric F. Quandt (ARDC No. 2267519)
Walter Jones, Jr. (ARDC No. 1365665)
John M. Broderick (ARDC No. 6255668)
PUGH, JONES, JOHNSON & QUANDT, P.C.
180 N. LaSalle Street, Suite 3400
Chicago, Illinois 60601
(312) 768-7800

## CERTIFICATE OF SERVICE

I, Eric F. Quandt, an attorney, certify that I shall cause to be served a copy of **Notice of Removal,** upon the following individual(s), by deposit in the U.S. mail box at 180 North LaSalle Street, Chicago, Illinois 60601, postage prepaid, same-day personal delivery by messenger, Federal Express overnight delivery, facsimile transmitted from (312) 768-7801, Electronic Case Filing ("ECF"), or as otherwise stated, as indicated below, on April 8, 2008 before 5:00 p.m.

| | | |
|---|---|---|
| ☐ | CM/ECF | *Counsel for Plaintiff* |
| ☒ | Facsimile/ 44 Pages | Nicholas A. Caputo |
| ☐ | Federal Express | Daniel P. Jackson |
| ☒ | U.S. Mail | Gloor Law Group, LLC |
| ☐ | Messenger | 225 W. Wacker Drive, Suite 1700 |
| | | Chicago, IL 60606 |
| | | (312) 752-3700 |
| | | (312) 752-3701 fax |
| | | |
| | | Sheila M. Bossier |
| | | Bossier & Associates, PLLC |
| | | 1520 North State Street |
| | | Jackson, MS 39202 |
| | | (601) 352-5450 |
| | | (601) 352-5452 fax |

s/Eric F. Quandt

# EXHIBIT A

36435/NAC/1063

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| DOROTHY TULEY, INDIVIDUALLY AND AS SPECIAL ADMINISTRATOR OF THE ESTATE OF NOAH TULEY, DECEASED | ) ) ) ) | |
| | ) | Case No. _____ |
| **Plaintiffs,** | ) ) | 2008 L01953 |
| | ) | CALENDAR/ROOM C |
| SMITHKLINE BEECHAM CORP. d/b/a GLAXOSMITHKLINE, INC., | ) ) ) | TIME 09:00 Product Liability |
| | ) | |
| **Defendants.** | ) | **JURY TRIAL DEMANDED** |

### COMPLAINT

Plaintiff, Dorothy Tuley, Individually and as Special Administrator of the Estate of Noah Tuley, Deceased ("Decedent") by and through her below-listed attorneys, alleges upon information and belief the following:

### STATEMENT OF FACTS

1.    This is a civil action brought by Plaintiff for damages arising out of the Decedent's ingestion of Rosiglitazone (Avandia®) and resulting death caused by the wrongful conduct of the Defendants, SMITHKLINE BEECHAM CORPORATION, GLAXOSMITHKLINE and SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITHKLINE, (hereinafter referred to as "Defendants" or "GSK"), in connection with the designing, developing, manufacturing, distributing, labeling, advertising, marketing, promoting, and selling of the widely-used diabetes prescription drug Avandia.

## INTRODUCTION AND PARTIES

2.  This is a civil action brought by Plaintiff for damages arising out of the Decedent's ingestion of Rosiglitazone, which was manufactured, distributed and sold to the Decedent by Defendant, GlasoSmithKline, Inc.

3.  The Decedent, Noah Tuley, was at the time of his death, an adult male resident citizen of Cook County, Illinois.

4.  Dorothy Tuley is the surviving spouse of Noah Tuley, deceased. She is a citizen of the State of Illinois, who currently resides in Posen, Cook County, Illinois. She has been duly appointed Special Administrator of the Estate of Noah Tuley, and as such, has standing to bring a suit for damages due to the wrongful death of her husband. (740 ILCS 180/0.01 *et seq*. (West 1998)) (Illinois Wrongful Death Act). Dorothy Tuley also has standing to bring a personal injury action on behalf of Decedent pursuant to (755 ILCS 5/27-6 (West 1998)) (Illinois Survival Act).

5.  GlaxoSmithKline (GSK) is incorporated under the laws of Pennsylvania and has its principal place of business in the United States at One Franklin Plaza, 200 N. 16th Street, Philadelphia, Pennsylvania. GSK is the surviving entity from the following mergers: On May 7, 1995, GSK merged into Burroughs Wellcome Co. In connection with that merger, Burroughs Wellcome Co. changed its name to Glaxo Wellcome, Inc. On March 31, 2001, Glaxo Wellcome, Inc. merged with GSK. As the surviving entity, GSK is liable for the actions and inactions of all the companies involved in the mergers. GSK is engaged in manufacturing, marketing, promoting, selling and/or distributing the drugs Avandia, Avandamet and Avandaryl and regularly conducts business within the state of Illinois and derives substantial revenues from goods consumed in Illinois.

2

6.    At all times material to this lawsuit, the Defendants were engaged in the business of, or was successor in interest to, entities engaged in the business of researching, licensing, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging, advertising, distributing and/or selling the prescription drug product Avandia, Avandamet and Avandaryl (hereinafter referred to individually or collectively as "Avandia" or "rosiglitazone") as an antidiabetic medication to the general public including Plaintiffs' Decedent.

7.    At all times material to this lawsuit, the Defendants were authorized to do business within the State of Illinois and did in fact supply Avandia within the State of Illinois.

## JURISDICTION AND VENUE

8.    This Court has jurisdiction over the subject matter of this action, and this Court has personal jurisdiction over the parties because Defendants conduct substantial business in this State have had systematic and continuous contact within this State, and have agents and representatives which can be found in this State.

9.    Venue is properly laid in this county, because Plaintiff is a resident citizen of Cook County, Illinois, because Plaintiff's Decedent was at the time of his death a resident citizen of Cook County, Illinois and because GSK, upon information and belief, at all times relevant, engaged in the business of designing, testing, manufacturing, advertising, labeling, marketing, promoting, selling and distributing Avandia throughout the State of Illinois, including Cook County, Illinois.

## FACTUAL ALLEGATIONS

10.    GSK manufactures, promotes, distributes, labels, and markets rosiglitazone under the trade name(s) of Avandia® Tablets, Avandamet® Tablets, and Avandaryl® Tablets.

3

11.     Rosiglitazone is a member of a class of drugs known as Thiazolidinediones (TZDs).

12.     Avandia® was first approved for use in the United States in 1999 for the use in treatment of type 2 diabetes mellitus, also known as non-insulin-dependent diabetes mellitus ("NIDDM") or adult-onset diabetes.

13.     In 2002, Avandamet®, a single pill combination of Avandia® and metformin, was approved in the United States for use in treatment of type 2 diabetes mellitus.

14.     In 2005, Avandaryl®, a single pill combination of Avandia® and Amaryl®, likewise was approved in the United States for use in treatment of type 2 diabetes mellitus.

15.     Type 2 diabetes is the most common form of diabetes and occurs where the body fails to properly use insulin (insulin resistance), combined with relative insulin deficiency[1]. Insulin, which is made in the pancreas, helps the body's cells use sugar from the bloodstream, which comes from foods and drinks. Sugar is a source of energy for cells[2]. The third type, gestational diabetes, affects about 4% of all pregnant women - about 135,000 cases in the United States each years[3].

16.     Most people with diabetes have health problems -- or risk factors -- that increase the risk for heart disease and stroke.  More than 65% of people with diabetes die from heart disease or stroke. With diabetes, heart attacks occur earlier in life and often result in death.

17.     Cardiovascular disease (CVD) is the main cause of death in these patients. Thus, it is important that an antidiabetic agent reduce the risk of cardiovascular injury.

---

[1] http://www.diabetes.org/about-diabetes.jsp.

[2] *Id.*

[3] *Id.*

4

18.   During the past decade, numerous drugs have been introduced for the treatment of type 2 diabetes that, used in monotherapy or in combination therapy, are supposed to better control the disease in patients and reduce the health complications often associated with diabetes, such as heart attacks, strokes and other cardiovascular complications.

19.   Thiazolidinediones (TZDs) are a novel class of insulin-sensitizing antidiabetic agents. In the USA and Canada, two TZDs are indicated for use in type 2 diabetes mellitus, rosiglitazone and pioglitazone. A third, troglitazone (Rezulin) has been removed from the market because of an association with significant hepatotoxicity.

20.   At all relevant times, GSK was in the business of designing, licensing, promoting, manufacturing, marketing, selling and distributing pharmaceuticals and other products, including Avandia.

21.   GSK is licensed to do business and in fact does business by agent in the state of Illinois. At all relevant times, GSK designed, developed, licensed, marketed, manufactured, sold and placed in the stream of commerce Avandia, including the Avandia at issue in this lawsuit. GSK did this throughout the United States, in this county and in the state of Illinois.

22.   Plaintiff's Decedent purchased and began to use Avandia which was prescribed for him by a physician licensed in the state of Illinois and he used it as prescribed. Avandia was manufactured, sold, distributed and placed in the stream of commerce by the Defendants.

23.   At the time Plaintiff's Decedent began to use Avandia, he did not know, and could not have known, that Avandia was defective and would cause injury and death.

24.   Plaintiff' Decedent did not know, and could not have known, that prior to the date he used Avandia referred to above, that the Defendants were aware and had knowledge that Avandia

which it manufactured, marketed, sold and distributed was defective and had the propensity to cause severe injury including death.

25.    In fact, Defendants knew as early as 1999 that Avandia was unreasonably dangerous and could cause heart attacks and deaths.

26.    In 1999, Dr. John B. Buse (the current president-elect of the American Diabetes Association), a diabetes expert and head of endocrinology at the University of North Carolina, Chapel Hill, raised concerns about Avandia and heart problems, including the risk of heart attack and death.

27.    GSK attempted to silence Dr. Buse and further conceal the true nature of Avandia risks by threatening Dr. Buse with a $4 Million lawsuit and by characterizing him as a liar[4].

28    In response to GSK's pressure, Dr. Buse sent a three-page letter to Dr. Tadataka Yamada, GSK's Chairman of Research and Development.  In the letter, Dr. Buse wrote, "I may disagree with GSK's interpretation of that data . . . I am not for sale . . . Please call off the dogs.  I cannot remain civilized much longer under this kind of heat." Eventually, Dr. Buse signed a clarifying statement with the company to help ease investor concerns.

29.    On March 15, 2000, John Buse, MD wrote a letter to the FDA again raising concerns about a "worrisome trend in cardiovascular deaths and severe adverse events" associated with Avandia:

> I would like you to know exactly what my concerns are regarding
> rosiglitazone as a clinical scientist and my approach as a clinician. On the
> basis of the increase in LDL concentration seen in the clinical trial program

---

[4] John Buse, M.D., Congressional Hearing Transcript (June 6, 2007).

6

(whether the number we accept as the truth is the 18.6% at 4 mg bid in the package insert or the "average of 12%" now being discussed) one would expect an increase in cardiovascular events. Based on studies with statins and plasmapheresis, changes in LDL concentration can be associated with substantial changes in vascular reactivity and endothelial function over a time course of days to weeks[5].

30.    Dr. Buse was not the only person to alert GSK to the increased risk of heart attack and death associated with Avandia. Shortly after Dr. Buse raised concerns related to increased risk of heart attacks associated with Avandia, Public Citizen filed a petition, on March 7, 2000, seeking immediate class labeling changes for all marketed TZDs[6], including rosiglitazone.

31.    In an independent investigation of the TZDs, Public Citizen, after studying reviews by FDA Medical Officers, Statisticians, and Pharmacologists, transcripts of FDA advisory committee meetings, and scientific literature on trolitazone, rosiglitazone, and pioglitazone, argued that information associating rosiglitazone to heart attacks and serious cardiovascular injuries "was never included in the label, or seriously understated[7]."

32.    Public Citizen cited studies submitted to the FDA for approval that evidenced lack of efficacy and increase in cardiovascular risks, including but not limited to the increased risk of suffering a heart attack.

---

[5] Letter from Dr. Buse to FDA (March 15, 2000).

[6] Public Citizen's Petition to the FDA requesting that it immediately require labeling for diabetes drugs troglitazone (Rezulin), rosiglitazone (Avandia) and pioglitazone (Actos) (HRG Publication #1514)(March 7, 2000).

[7] *Id.* at 1.

33.    Public Citizen argued that no where in the product insert was there any mention of myocardial infarction even where the increased risk of myocardial infarctions was found in GSK's own studies.

34.    Public Citizen pointed to several studies, many of which were studies conducted by GSK. The conclusion reached by Public Citizen was that rosiglitazone was not as effective as alleged and the ingestion of rosiglitazone increased the risk of myocardial infarction, death and other serious cardiovascular injuries[8].

35.    This is obviously a major concern since diabetics are already susceptible to an increased risk of cardiovascular injury.

36.    In addition to the concerns raised by Dr. Buse and Public Citizen, there has also been three meta-analyses conducted. Each meta-analysis has found that Avandia increases the risk of cardiovascular-related injury, including but not limited to myocardial infarction and death.

37.    A meta-analysis combines the result of several studies that address a set of related research hypotheses.

38.    The first analysis was performed by GSK and was handed over to the FDA in August of 2006. The meta-analysis consisted of 42 separate double-blinded, randomized, controlled clinical trials to assess the efficacy of rosiglitazone for treatment of type 2 diabetes compared to either placebo or other antidiabetic therapies in patients with type 2 diabetes. The combined studies included 8,604 patients on rosiglitazone and 5,633 patients randomized to a variety of alternative therapeutic regimens, including placebo.

---

[8] *Id* at 6.

8

39.    GSK's own meta-analysis found an overall incidence of myocardial ischemia in rosiglitazone-treated subjects. The risk equated to more than a 30 percent excess risk of myocardial ischemic events in rosiglitazone-treated patients.

40.    A second meta-analysis conducted by Dr. Steven Nissen and Kathy Wolski titled Effect of Rosiglitazone on the Risk of Myocardial Infarction and Death from Cardiovascular Causes was published on May 21, 2007, in the New England Journal of Medicine (NEJM).

41.    Nissen and Wolski reviewed data available to them through published literature, the FDA website, and GlaxoSmithKline's clinical-trials registry. The analysis included a review of 42 clinical trials involving nearly 28,000 patients.

42.    Nissen and Wolski concluded that "[r]osiglitazone was associated with a significant increase in the risk of myocardial infarction and with an increase in the risk of death from cardiovascular causes that had borderline significance[9]."

43.    Hence, it was found that patients suffering from Type 2 diabetes mellitus have a higher risk of experiencing a heart attack within seven years than non-diabetic patients. But a diabetic taking Avandia has a much greater risk of suffering a heart attack or serious cardiovascular event an estimated 43 percent increase or greater Bwhen compared with other diabetes drugs or placebos.

44.    On July 30, 2007, the FDA presented its results of the FDA meta-analysis. Similar to the GSK and Nissen/Wolski findings, the FDA likewise found an increase risk of heart attack,

---

[9] Nissen SE and Wolski K., *Effects of Rosiglitazone on the Risk of Myocardial Infarction and Death from Cardiovascular Causes, N. Engl J Med:* 356, May 21, 2007.

9

cardiovascular death, stroke and other serious ischemic related adverse events and ultimately recommended that a boxed warning be placed on the Avandia label.

45. Thus, while GSK's rosiglitazone-containing drugs are marketed and sold by GSK as antidiabetic agents that reduce a diabetic patient's risk of heart attacks, studies conducted by GSK showed that rosiglitazone actually increases those risks by 43 percent according to the Nissen/Wolski meta-analysis and by 31 percent according to GSK's own meta-analysis.

46. Yet, even with this information available to it, GSK failed to warn consumers and the medical community about the increased risk of heart attacks and other serious injuries associated with Avandia.

47. Moreover, Defendants have repeatedly engaged in a pattern of conduct of deliberately avoiding FDA recommendations as to which issues relating to public hazards should be warned about.

48. For instance, after the FDA required GSK to change its label on February 8, 2001, to reflect a risk of heart failure observed in patients on Avandia and insulin, GSK defied FDA recommendations by engaging in false and misleading promotional activities.

49. In a letter dated February 22, 2001, the FDA's Division of Drug Marketing, Advertising and Communications (DDMAC) informed GSK that all promotional materials for Avandia should be revised to prominently include the new risks, no later than March 8, 2001.

50. GSK responded on March 1, 2001, wherein GSK committed to include the new risk information by March 8, 2001.

51.    However, instead of complying with FDA requirements GSK's sales representatives engaged in false or misleading promotional activities with respect to the new risk information in Avandia's product labeling.

52.    In a Warning Letter dated July 17, 2001, the FDA warned GSK that it had engaged in a continual violation of federal regulations in its promotional activities for the marketing of Avandia.

53.    In that July 17, 2001 letter, the FDA warned that the DDMAC had been monitoring its marketing of Avandia and had:

> [C]oncluded that GSK has promoted Avandia in violation of the Federal Food, Drug, and Cosmetic Act (Act) and its implementing regulations. See 21 U.S.C. §§ 331(a),(b), and 352(a),(n).
>
> Specifically, during the 10th Annual American Association of Clinical Endocrinologists (AACE) Meeting in San Antonio, Texas, on May 2-6, 2001, representatives of GSK made oral representations denying the existence of serious new risks associated with Avandia at GSK's promotional exhibit booth. Additionally, GSK displayed Exhibit panels (AV013G) at the meeting that minimized these new risks associated with Avandia.
>
> Your promotional activities that minimize serious new risks are particularly troublesome because we have previously objected, in two untitled letters, to your dissemination of promotional material for Avandia that failed to present any risk information about Avandia or minimized the hepatic risk associated with Avandia. Despite your assurances that such violative promotion of Avandia had ceased, your violative promotion of Avandia has continued.[10]

---

[10] Letter from Thomas Abrams, R.Ph., MBA, Director of the FDA's Division of Drug Marketing, Advertising and Communications of JP Garnier, Chief Executive Officer, GlaxoSmithKline (July 17, 2001) (on file with the FDA).

54.     Following the May 21, 2007 NEJM publication of the Nissen/Wolski meta-analysis, the FDA issued a safety alert for Avandia and advised patients who take it to consult their doctors.

55.     On June 1, 2007, GSK published a "Dear Avandia Patient" letter, which responded to the "recent press coverage about the safety of Avandia." Therein, GSK stated that it "stands firmly behind Avandia" and that "Avandia is the most widely studied medicine for type 2 diabetes" and that the evaluation of clinical trials by "well-informed experts and researcher has been encouraging."

56.     At the congressional hearing on June 6, 2007, the FDA indicated that a black box warning should be added to rosiglitazone (Avandia), for increased risk of heart failure.

57.     On July 30, 2007, the FDA held an Advisory Committee Hearing on the safety of Avandia. The panel was determining whether to recommend keeping the label the same, adding a black box warning, or taking Avandia off the market all together.

58.     Dr. David Graham, testifying on behalf of the FDA, called for withdrawing Avandia and estimated that its toxic effects on the heart had caused up to 205,000 heart attacks and strokes, some fatal, from 1999 to 2006. For every month that Avandia is sold, Dr. Graham said, 1,600 to 2,200 patients will suffer more of those problems.

59.     The FDA provided testimony that Avandia offers no unique benefits compared to other drugs in battling diabetes, but that all indications point to increased risks of heart attack and sudden death.

60.     The panel of advisers to the Food and Drug Administration voted 20-to-3 that Avandia increases the risks of heart attacks.

61.   Despite knowing of this defect prior to the date of Plaintiff's Decedent's death due to the use of Avandia, the Defendants took inadequate steps to advise physicians, hospitals, nursing homes and other health care providers of the possibility of heart attacks and death.

62.   Despite having actual notice of the dangerous propensities associated with Avandia, prior to the date Plaintiff's Decedent purchased and used Avandia, the Defendants took inadequate steps to advise consumers or medical providers, including Plaintiff's Decedent of the known dangers of Avandia consumption, including but not limited to the increased risk of heart attacks and deaths. The Defendants failed to take adequate steps to ensure that the Avandia it manufactured was safe for the public and would function in the manner in which they were intending.

63.   The Avandia ingested by Plaintiff's Decedent defective in that it exposed him to the risk of suffering a heart attack and that it could ultimately lead to his death. As a result of using said Avandia, Plaintiff's Decedent, Noah Tuley suffered an acute myocardial infarction on February 18, 2006 as a direct and proximate result of his ingestion of Avandia.

64.   Even after being made aware of the numerous reports of myocardial infarctions, including those adverse events that occurred during GSK's own studies, Defendants still failed to take all reasonable and necessary steps to ensure that the consuming public, including Plaintiff's Decedent, was aware of the increased risk of suffering a heart attack or death. As stated in the above, Defendants knew that Avandia caused heart attacks and deaths.

65.   Plaintiff allege that GSK was aware of the dangerous propensity of Avandia referred to herein, that they knew the risks and dangers posed to those using Avandia, and Defendants acted with willful and wanton disregard for the safety of the consuming public, including Plaintiff's Decedent.

13

66.    Defendants have widely promoted the use of Avandia as a safe and effective method of treating type 2 diabetes mellitus.

67.    Due to the efforts of the Defendants, sales of Avandia rose to more than three billion ($3,246,555,709.7600) dollars in 2006.[11]

68.    GSK's net income (adjusted earnings) in 2006 was approximately $10.6 billion.

69.    As a result of Defendants' efforts and actions, the sales of Avandia have become an enormous source of profits for Defendants.

70.    Accordingly, the Defendants had a significant financial incentive to suppress, misrepresent and/or conceal any potential dangers or risks associated with Avandia.

71.    Plaintiff asserts that GSK acted for the purpose of maximizing profits at the expense of the health of Plaintiff's Decedent, and the health of others using Avandia. Plaintiff further asserts that these Defendants had actual or constructive knowledge that Avandia posed a significant danger to anyone who used the drug, yet failed to take adequate or timely actions to prevent the injuries and deaths of users of Avandia or to warn the public of these dangers.

72.    GSK failed to adequately or appropriately disclose material information relating to the dangers associated with Avandia. As a result, users of Avandia, including Plaintiff's Decedent, were unaware of these dangers, did not have adequate information to know the warnings signs of being exposed to rosiglitazone and were therefore unable to avoid injury caused by using this defective drug product.

---

[11] http://www.gsk.com/investors/reps06/annual_review_2006/key_products.htm.

14

## FIRST CAUSE OF ACTION - STRICT LIABILITY

73. Plaintiff adopts and realleges the foregoing paragraphs of this complaint as if fully set forth herein.

74. Defendants were, at all relevant times, engaged in the business of designing, creating, manufacturing, testing, labeling, packaging, supplying, marketing, selling, advertising, warning and otherwise distributing and placing in the stream of commerce Avandia.

75. Plaintiff's Decedent purchased and/or otherwise properly acquired Avandia.

76. Avandia reached Plaintiff's Decedent, the ultimate user and consumer of this product, without any substantial change in its condition from the time it was manufactured and/or sold by Defendants.

77. Avandia, when it reached Plaintiff's Decedent, was in a defective condition and/or was in a condition that was unreasonably dangerous to the ultimate user or consumer. Said Avandia was dangerous to an extent beyond that which would be contemplated by the ordinary user or consumer who purchased it with the ordinary knowledge common to the community as to the product's characteristics.

78. Plaintiff's Decedent used Avandia, as it was designed and intended to be used, and suffered a myocardial infarction as a result. Said injuries were the direct and proximate result of the product' defective and/or unreasonably dangerous condition.

79. As a direct and proximate result of Defendants' designing, creating, manufacturing, testing, labeling, packaging, supplying, marketing, selling, advertising, warning and otherwise distributing and placing in the stream of commerce the Avandia at issue in this lawsuit, Plaintiff's Decedent suffered a myocardial infarction.

15

80.     The conduct of these Defendants, as set forth herein, was so outrageous and improper as to constitute willful, wanton and reckless disregard for the safety of Plaintiff's Decedent and the users and ultimate consumers of this product.

81.     Defendants showed a reckless disregard for the public safety due to Defendants' acts and omissions as set forth in this Complaint. Defendants knew, or should have known, that there was a substantial and unnecessary risk of injury and death to those who used Defendants' product and Defendants failed to either determine the seriousness of the danger or reduce the risk to an acceptable minimal level.

82.     There was a serious risk of harm to the public that resulted from the defect in Avandia. Defendants were aware of the existence and seriousness of the defects prior to the death of Plaintiff's Decedent. Defendants did not correct the defects, or take other steps to reduce the danger of injury. The amount it would have cost to correct the defect, or reduce the danger, was small compared to the risk the defect posed to consumers and users of Avandia. The amount of profits that Defendants received from other sales of the defective drug was in the millions of dollars. Defendants attempted to conceal the defect or deceive the public about the safety of Avandia; and, Defendants have very significant financial resources.

83.     At all times relevant herein, Defendants manufactured, labeled, sold, distributed, supplied, dispensed, promoted and/or otherwise placing into the stream of commerce Avandia which was defective, including one or more of the following particulars:

a.     Avandia contained unreasonably dangerous design defects and was not reasonably safe as intended to be used, subjecting Plaintiff's Decedent to risks which exceeded the benefits of the drug;

16

b.  When manufactured, packaged, assembled, labeled, distributed, supplied, and placed in the stream of commerce, the drug contained unreasonably dangerous design defects and was not reasonably safe as intended to be used, subjecting Plaintiff's Decedent to risks which exceeded the benefits of the drug;

c.  When manufactured, packaged, assembled, labeled, distributed, supplied, and placed in the stream of commerce, it was defective in design and formulation, making use of the drug more dangerous than an ordinary consumer would expect and more dangerous than other risks associated with diabetes;

d.  Avandia was insufficiently tested;

e.  Avandia was marketed to be used in a combination which was known to the Defendants to cause harmful side effects which outweighed any potential utility;

f.  Avandia is not safe for its intended use as an anti-diabetic agent;

g.  GSK failed to provide adequate warning of the danger involved in the administration of rosiglitazone;

h.  GSK failed to warn against the use of Avandia without proper supervision and monitoring;

I.  The defective Avandia was defective in design and formulation, making use of the product more dangerous than the ordinary consumer would expect and more dangerous than other risks associated with like products;

j.  The defective Avandia contained insufficient and/or incorrect warnings to alert consumers and users of the risks of adverse effects;

17

k.      The defective medication was not safe for their intended use and were inadequately

tested; and/or

l.      The defective Avandia was not accompanied by adequate instructions and/or

warnings to fully apprise the prescribing physicians as well as the ultimate

consumers, including Plaintiff's Decedent, of the full nature or extent of the risks and

side effects associated with its use.

84.      Defendants knew and intended that the Avandia would be used by such consumers

without any inspection for defects, and would rely upon the representations made by Defendants on

the product label and otherwise.

85.      At the time of its manufacture and sale to Plaintiff's Decedent, Avandia was unsafe

and defective to consumers using said product for its advertised purposes and in a reasonably

foreseeable manner, in that it posed an unreasonably high risk of serious injury or death to

consumers, which information was concealed by Defendants.

86.      Prior to the manufacturing, sale and distribution of Avandia, Defendants knew, or

were reckless in not knowing, that Avandia was in a defective condition.

87.      Plaintiff's Decedent used the products for its intended purpose and could not have

discovered any defect therein through the exercise of due care.

88.      Defendants, as manufacturers, marketers, distributors and sellers of Avandia are held

to the level of knowledge of an expert in their field.

89.      Plaintiff's Decedent did not have substantially the same knowledge, as an adequate

warning from Defendants should have communicated to him.

90.   But for the aforementioned defective and unreasonably dangerous conditions, the drug would not have been prescribed to Plaintiff's Decedent, Plaintiff's Decedent would not have ingested the drug, and Plaintiff's Decedent would not have suffered a heart attack as alleged herein.

91.   As a direct and legal result of the defective condition of the drug, Plaintiff's Decedent suffered a myocardial infarction in February 2006.

92.   WHEREFORE, Plaintiff demands judgment against Defendants for compensatory damages in an amount to be determined by a jury and demands trial by jury of all issues triable as of right by a jury.

## SECOND CAUSE OF ACTION - NEGLIGENCE

93.   Plaintiff adopts and realleges the foregoing paragraphs of this complaint as if fully set forth herein.

94.   Defendants had a duty to exercise reasonable care in designing, creating, manufacturing, testing, labeling, packaging, supplying, marketing, selling, advertising, warning and otherwise distributing and placing in the stream of commerce Avandia.

95.   Defendants failed to exercise reasonable care in designing, creating, manufacturing, testing, labeling, packaging, supplying, marketing, selling, advertising, warning and otherwise distributing and placing in the stream of commerce Avandia.

96.   At all times material hereto, Defendants had a duty to Plaintiff's Decedent to exercise reasonable care in the making, creation, manufacture, assembly, design, sterilization, testing, labeling, supplying, packaging, distribution, promotion, marketing, advertising, warning and/or sale of their respective drug products.

19

97.    Defendants breached that duty and were negligent in their actions, misrepresentations, and omissions toward Plaintiff's Decedent in ways which include, but are not limited to, the following:

a.    Failure to include adequate warnings with the drugs that would alert physicians to the potential risks and serious side affects of the drugs;

b.    Failure to adequately and properly test the drugs before placing the drugs on the market;

c.    Failure to conduct sufficient testing on the drugs which, if properly performed, would have shown that the drugs had serious and dangerous side effects;

d.    Failure to adequately warn Plaintiff's Decedent's prescribing physician that use of the drugs should be accompanied by a professional examination and regularly scheduled follow-up examinations so that myocardial infarctions and other serious cardiovascular injuries could be avoided or detected early;

e.    Failure to adequately warn Plaintiff's Decedent's prescribing physician that use of the drug carried a risk of temporary or permanent disability due to myocardial infarction or death;

f.    Failure to provide adequate post-marketing warnings or instructions after the Defendants knew or should have known of the significant risks of myocardial infarction and death from the use of Avandia;

g.    Failure to adequately warn Plaintiff's Decedent's prescribing physician that the drug products should not be prescribed for a long period of time;

20

h.     Failure to warn Plaintiff's Decedent's prescribing doctors that the drug product would not reduce diabetic complications and actually increase one's risk of myocardial infarction and death;

I.     Failure to warn Plaintiff's Decedent's prescribing doctors that the use of the drug products had not been studied as to safety in animals or humans;

j.     Encouraging misuse and overuse while underplaying the side effects to doctors and the public in order to make a profit from sales;

k.     Failure to properly manufacture, develop, assemble, prepare, design, sterilize, test, label, supply, package, distribute, promote, market, advertise, warn, and sell Avandia; and

l.     Failure to conduct proper, adequate and appropriate pre- and post- marketing surveillance of drug reactions, adverse events, and safety signals, including failure to recognize clear product safety signals, as proper surveillance would have revealed.

98.     Defendants knew, or should have known, that the defective condition of Avandia created an unreasonable risk of bodily harm to anyone using said products.

99.     Despite the fact that Defendants knew, or should have known, that the defective condition of Avandia could cause serious and life threatening injuries to anyone who used Avandia, Defendants took inadequate steps to ensure that said products were safe, to notify consumers of this danger, to prevent said products from being used by persons such as Plaintiff's Decedent.

100.     Defendants knew, or should have known, that it was foreseeable that consumers, such as Plaintiff's Decedent, would suffer injuries as a result of these Defendants' failures to exercise ordinary care.

21

101.    The negligence of Defendants was a direct or contributing cause of the heart attack of Plaintiff's Decedent.

102.    The negligent conduct of Defendants as set out in this Complaint was a direct and proximate cause of the heart attack of Plaintiff's Decedent.

103.    There was a serious risk of harm to the public that resulted from the defect in Avandia. The Defendants were aware of the existence and seriousness of the defect. Defendants did not correct the defect, or take other steps to reduce the danger of injury.

104.    The amount it would have cost to correct the defect, or reduce the danger, was small compared to the risk the defect posed to consumers and users Avandia. The amount of profits that Defendants received from other sales of the defective drug was in the millions of dollars.

105.    The Defendants attempted to conceal the defect or deceive the public about the safety of Avandia; and the Defendants have very significant financial resources.

106.    But for the Defendants' negligent conduct as described herein, Plaintiff's Decedent's prescribing physician would have never prescribed Avandia, Plaintiff's Decedent would not have ingested Avandia, and Plaintiff's Decedent would not have suffered harm from ingesting Avandia.

107.    As a direct and legal result of the negligence of Defendants, Plaintiff's Decedent suffered a myocardial infarction.

108.    The conduct of GSK, as set forth herein, was so outrageous and improper as to constitute willful, wanton and reckless disregard for the safety of Plaintiff's Decedent and the users and ultimate consumers of this product and as such Plaintiff are entitled to and hereby claim Punitive Damages in this action.

·109.    WHEREFORE, Plaintiff demands judgment against Defendants for compensatory and punitive damages in an amount to be determined by a jury and demands trial by jury of all issues triable as of right by a jury.

## THIRD CAUSE OF ACTION -- BREACH OF IMPLIED WARRANTY

110.    Plaintiff adopts and realleges each of the foregoing paragraphs of this complaint as if fully set forth herein.

111.    At the time GSK marketed, distributed, and sold Avandia to Plaintiff's Decedent, GSK warranted that Avandia was merchantable and fit for the ordinary purposes for which it was intended. ·

112. .    GSK sold Avandia with an implied warranty that it was fit for the particular purpose of safely treating diabetes.

·113.    Members of the consuming public, including Plaintiff's Decedent, were intended third party beneficiaries of the warranty.

114.    · Avandia was not merchantable and fit for its ordinary purpose because it had a known propensity to lead to heart attack and stroke, among other serious side effects, and could cause death.

115.    Avandia was not fit for the particular purpose of safely treating diabetes, because it had a known propensity to lead to heart attack and death, among other serious side effects.

116.    Plaintiff reasonably relied upon GSK's representations that Avandia was safe and free of defects and was safe for treating diabetes.

117.    GSK's breach of the implied warranty was the direct and proximate cause of Plaintiff's Decedent death.

118.    The conduct of GSK, as set forth herein, was so outrageous and improper as to constitute willful, wanton and reckless disregard for the safety of Plaintiff's Decedent and the users and ultimate consumers of this product. GSK made conscious decisions not to redesign, revise the label, warn or inform the consuming public and as such Plaintiff are entitled to and hereby claim Punitive Damages in this action.

119.    WHEREFORE, Plaintiff demands judgment against Defendants for compensatory damages in an amount to be determined by a jury and demands trial by jury of all issues triable as of right by a jury.

## FOURTH CAUSE OF ACTION -- BREACH OF EXPRESS WARRANTY

120.    Plaintiff adopts and realleges each of the foregoing paragraphs of this complaint as if fully set forth herein.

121.    GSK expressly warranted that Avandia was safe and effective to members of the consuming public, including Plaintiff's Decedent.

122.    Members of the consuming public, including Plaintiff's Decedent, were intended third party beneficiaries of the warranty.

123.    GSK marketed, promoted and sold Avandia as safe for the treatment of diabetes

124.    Avandia does not conform to these express representations because it is not safe and has serious side effects, including myocardial infarction and death.

125.    GSK breached their express warranty in one of more of the following ways:

a.    Avandia, as designed, manufactured, sold and/or supplied by GSK, was defectively designed and placed in to the stream of commerce by GSK in a defective and unreasonably dangerous condition.

24

b.    GSK failed to warn and/or place adequate warnings and instructions on Avandia.

c.    GSK failed to adequately test Avandia.

d.    GSK failed to provide timely and adequate post-marketing warnings and instructions after they knew the risk of injury from Avandia.

126.    Plaintiff's Decedent reasonably relied upon GSK's warranty that Avandia was safe and effective when he purchased and used the medication.

127.    Plaintiff's Decedent's death was the direct and proximate result of GSK's breach of their express warranty.

128.    The conduct of GSK, as set forth herein, was so outrageous and improper as to constitute willful, wanton and reckless disregard for the safety of Plaintiff's Decedent and the users and ultimate consumers of this product. GSK risked the lives of their consumers, including Plaintiff's Decedent, with knowledge of the safety and efficacy not to redesign, revise the label, warn or inform the consuming public, in addition to suppressing this information from the general public. As such Plaintiff are entitled to and hereby claims Punitive Damages in this action.

129.    WHEREFORE, Plaintiff demands judgment against Defendants for compensatory damages in an amount to be determined by a jury and demands trial by jury of all issues triable as of right by a jury.

### FIFTH CAUSE OF ACTION -- NEGLIGENT FAILURE TO WARN

130.    Plaintiff adopts and realleges each of the foregoing paragraphs of this complaint as if fully set forth herein.

131.    Prior to Plaintiff's Decedent's use of Avandia, and during the period in which he used it, GSK knew or had reason to know that Avandia was dangerous and created an unreasonable risk of bodily harm to consumers.

132.    GSK had a duty to exercise reasonable care to warn end users of the dangerous conditions or of the facts that made Avandia likely to be dangerous

133.    Despite the fact that Defendants knew, or should have known, that the defective condition of Avandia could cause serious and life threatening injuries to anyone who used Avandia, Defendants took inadequate steps to ensure that said products were safe, to notify consumers of this danger, to prevent said products from being used by persons such as Plaintiff's Decedent, and to exercise reasonable care in warning the medical community.

134.    Plaintiff's Decedent's death was a direct and proximate result of GSK's failure to warn of the dangers of Avandia.

135.    The conduct of GSK, as set forth herein, was so outrageous and improper as to constitute willful, wanton and reckless disregard for the safety of Plaintiff's Decedent and the users and ultimate consumers of this product. GSK made conscious decisions not to redesign, revise the label, warn or inform the consuming public, in addition to suppressing this information from the general public. As such Plaintiff are entitled to and hereby claims Punitive Damages in this action.

136.    WHEREFORE, Plaintiff demands judgment against Defendants for compensatory damages in an amount to be determined by a jury and demands trial by jury of all issues triable as of right by a jury.

## SIXTH CAUSE OF ACTION -- MISREPRESENTATIONS

137.    Plaintiff adopts and realleges each of the foregoing paragraphs of this complaint as if fully set forth herein.

138.    Prior to Plaintiff's Decedent's first use of Avandia, and during the time period in which he used it, GSK misrepresented that Avandia was a safe and effective treatment for diabetes. GSK also failed to disclose material facts regarding the safety and efficacy of Avandia, including information relating to adverse events, harmful side effects, and results of clinical studies showing that the use of Avandia could cause myocardial infarction and death.

139.    GSK had a duty to provide Plaintiff's Decedent and other consumers with true and accurate information and warnings of any known risks and side effects of the medications they marketed, distributed and sold.

140.    GSK knew, or should have known, based on adverse event reports, studies and knowledge of the efficacy and safety failures of Avandia and prior experience, that their representations regarding Avandia were false, and that they had a duty to disclose the dangers of Avandia.

141.    GSK made the representations and failed to disclose the material facts with the intent to induce consumers, including Plaintiff's Decedent, to act in reliance by purchasing Avandia.

142.    Plaintiff's Decedent justifiably relied on GSK's representations and nondisclosures by purchasing and using Avandia.

143.    On information and belief, Defendants negligently, recklessly, intentionally and fraudulently made material misrepresentations   and wrongfully withheld relevant information

27

relating to the dangerous propensity of Avandia from health care providers and from the users of this product.

144.    On information and belief, Defendants failed to advise Plaintiff's Decedent and other users of Avandia in a timely manner of the defects in the medication at issue.

145.    GSK's advertisements regarding Avandia made material misrepresentations Defendants knew to be false, for the purpose of fraudulently inducing consumers, including Plaintiff's Decedent, to purchase such product. Plaintiff's Decedent relied upon these material misrepresentations in deciding to purchase and consume Avandia.

146.    GSK's misrepresentations and omissions regarding the safety and efficacy of Avandia was the direct and proximate cause of Plaintiff's Decedent's death.

147.    The conduct of GSK, as set forth herein, was so outrageous and improper as to constitute willful, wanton and reckless disregard for the safety of Plaintiff's Decedent and the users and ultimate consumers of this product. GSK risked the lives of their consumers, including Plaintiff, with knowledge of the safety and efficacy not to redesign, revise the label, warn or inform the consuming public, in addition to suppressing this information from the general public. As such Plaintiff are entitled to and hereby claims Punitive Damages in this action.

148.    WHEREFORE, Plaintiff demands judgment against Defendants for compensatory damages in an amount to be determined by a jury and demands trial by jury of all issues triable as of right by a jury.

### SEVENTH CAUSE OF ACTION -- UNJUST ENRICHMENT

149.    Plaintiff repeats and reiterates the allegations previously set forth herein.

150.    Defendants have been and continue to be enriched by their fraudulent acts and omissions alleged herein.

151.    These fraudulent acts and omissions allow Defendants to gain millions of dollars in profits that would not have been gained but for Defendants' fraudulent acts and omissions.

152.    Plaintiff suffered damages due to Defendants' acts and omissions as alleged herein.

153.    Defendants have been and continue to be unjustly enriched as a result of their fraudulent acts and omissions.

154.    Defendants lack legal justification for engaging in a course of fraudulent acts and omissions as alleged herein at Plaintiff's expense.

155.    No other remedy at law can adequately compensate Plaintiff for the damages occasioned by Defendants' conscious choice to engage in a course of fraudulent acts and omissions.

### EIGHTH CAUSE OF ACTION - WRONGFUL DEATH

156.    Plaintiff repeats and reiterates the allegations previously set forth herein, and further alleges:

157.    That as a direct and proximate result of one or more of the aforesaid acts or omissions of the Defendants, complained of here and above, Plaintiff's Decedent, Noah Tuley, suffered severe injuries, resulting in his death. As a result, the next-of-kin of the Decedent have suffered great losses of a personal and pecuniary nature, including the loss of companionship and society of the Decedent, subjecting the Defendants to liability pursuant to 740 ILCS 180/0.01 *et seq.*, commonly known as the Illinois Wrongful Death Act.

29

## NINTH CAUSE OF ACTION - SURVIVAL

158.   Plaintiff repeats and reiterates the allegations previously set forth herein, and further alleges:

159.   That as a direct and proximate result of one or more of the aforesaid acts or omissions of the Defendants complained of here and above, Plaintiff's Decedent, Noah Tuley, suffered severe injuries, suffered severe pain, both mental and physical, incurred substantial medical bills, lost income, and was prevented from attending to his normal affairs, subjecting the Defendants to liability pursuant to 755 ILCS 5/27-6, commonly known as the Illinois Survival Act.

## WILFUL AND WANTON CONDUCT

160.   At all times relevant hereto, Defendant GlaxoSmithKline actually knew of the defective nature of Rosiglitazone as set forth herein and continued to design, manufacture, market, distribute and sell Rosiglitazone so as to maximize sales and profits at the expense of the public's health and safety and in conscious disregard of the foreseeable serious harm caused by Rosiglitazone. Defendant GlaxoSmithKline's deceptive conduct exhibits such an entire want of care as to establish that is actions were a result of fraud, ill will, malice, recklessness, and/or willful and intentional disregard for the safety and rights of Plaintiff's Decedent, as well as the general public and/or consumers of Rosiglitazone.

## JURY DEMAND

161.   Plaintiff hereby requests a trial by jury on all issues in this case.

## PRAYER FOR RELIEF

162.   Plaintiff prays that a judgment be entered in favor of Plaintiff in such aggregate sum as will fairly and reasonably compensate Plaintiff for damages arising out of Defendants' conduct as

described herein. The conduct of Defendants, as alleged herein, was a direct, proximate and producing cause of the damages to Plaintiff and Plaintiff's Decedent and the following general and specific damages:

A.  Reasonable attorneys' fees and costs;

B.  Compensatory damages;

C.  Physical pain and suffering of Plaintiff's Decedent;

D.  Mental anguish of Plaintiff;

E.  Medical and Counseling expenses;

F.  Loss of Companionship and Society of Decedent;

G.  Funeral Expenses;

H.  Pre and post-judgment interest at the lawful rate; and/or

I.  Such other applicable damage as the Court deems appropriate at law or in equity.

Respectfully submitted,

THE GLOOR LAW GROUP, LLC

By: _____

Attorneys for Plaintiff, DOROTHY TULEY,
Administrator of the Estate of NOAH TULEY,
Deceased

Sheila M. Bossier
Bossier & Associates, PLLC
1520 North State Street
Jackson, MS 39202
601-352-5450

Nicholas A. Caputo
Daniel P. Jackson
Gloor Law Group, LLC
225 W. Wacker Dr, Suite 1700
Chicago, IL 60606
312-752-3700
6838623

31

RECEIVED

MAR 1 3 2008

DEBRA HINTON
LAW DEPARTMENT



CORPORATION SERVICE COMPANY'

SXY / ALL
Transmittal Number: 5652565
Date Processed: 03/12/2008

# Notice of Service of Process

| | |
|---|---|
| Primary Contact: | Debra Hinton<br>SmithKline Beecham Corporation<br>One Franklin Plaza<br>200 North 16th, FP 2335<br>Philadelphia, PA 19102 |

| | |
|---|---|
| Entity: | SmithKline Beecham Corporation<br>Entity ID Number 1681448 |
| Entity Served: | SmithKline Beecham Corporation |
| Title of Action: | Dorothy Tuley vs. Smithkline Beecham Corporation |
| Document(s) Type: | Summons/Complaint |
| Nature of Action: | Product Liability |
| Court: | Cook Circuit Court, Illinois |
| Case Number: | 08 L 1850 |
| Jurisdiction Served: | Illinois |
| Date Served on CSC: | 03/12/2008 |
| Answer or Appearance Due: | 30 Days |
| Originally Served On: | CSC |
| How Served: | Personal Service |
| Plaintiff's Attorney: | Nicholas A. Caputo<br>312-752-3700 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

*CSC is SAS70 Type II certified for its Litigation Management System.*

2711 Centerville Road  Wilmington, DE 19808  (888) 690-2882  |  sop@cscinfo.com

| 2120 - Served | 2121 - Served | |
|---|---|---|
| 2220 - Not Served | 2221 - Not Served | |
| 2320 - Served By Mail | 2321 - Served By Mail | |
| 2420 - Served By Publication | 2421 - Served by Publication | |
| SUMMONS | ALIAS SUMMONS | (7-90) CCG-1 |

## IN THE CIRCUIT COURT OF COOK COUNTY ILLINOIS
## COUNTY DEPARTMENT, MUNICIPAL DIVISION

DOROTHY TULEY, Individually and as Special Administrator of the Estate of NOAH TULEY, Deceased,

plaintiff,

v.

SMITHKLINE BEECHAM CORPORATION, et al.

defendant.

Case No. 08 L 1850, Calendar C

PROCESS SERVER PLEASE SERVE:

Illinois Corporation Service C
(Agent for Defendant SmithKline Beecham Corporation)
801 Adlai Stevenson Dr.
Springfield, IL 62703

### SUMMONS

To each defendant:

YOU ARE SUMMONED and required to file an answer in this case, or otherwise file your appearance in the office of the clerk of this court (located in the Richard J. Daley Center, Room *801, Chicago, Illinois 60602), within 30 days after service of this summons, not counting the day of service. IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF ASKED IN THE COMPLAINT, A COPY OF WHICH IS HERETO ATTACHED.

To the officer:

This summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this summons shall be returned so endorsed. This summons may not be served later than 30 days after its date. MAR 0 4 2008

WITNESS........................................, 20......

...................................... DOROTHY BROWN
Clerk of the CIRCUIT COURT

Date of service:........................, 20....
(To be inserted by officer on copy left with
Defendant or other person)

| Name | Nicholas A. Caputo |
| | GLOOR LAW GROUP, LLC |
| Attorney for | Plaintiff |
| Address | 225 W. Wacker Drive - Suite 1700 |
| City | Chicago, IL 60606 |
| Telephone | (312) 752-3700 |
| Atty No. | 42472 |

## DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY

*Law Division Room 801
Chancery-Divorce Division Room 802
County Division Room 801
Probate Division Room 1202
#6838924

2120 - Served     2121 - Served
2220 - Not Served    2221 - Not Served
2320 - Served By Mail   2321 - Served By Mail
2420 - Served By Publication  2421 - Served by Publication
SUMMONS     ALIAS SUMMONS     (7-90) CCG-1

## IN THE CIRCUIT COURT OF COOK COUNTY ILLINOIS
## COUNTY DEPARTMENT, MUNICIPAL DIVISION

DOROTHY TULEY, Individually and as Special
Administrator of the Estate of NOAH TULEY, Deceased,

          plaintiff,

   v.

SMITHKLINE BEECHAM CORPORATION, et al.

         defendant.

Case No.  08 L 1850, Calendar C

PROCESS SERVER PLEASE SERVE:

Illinois Corporation Service C
(Agent for Defendant SmithKline
Beecham Corporation)
801 Adlai Stevenson Dr.
Springfield, IL 62703

### SUMMONS

To each defendant:

  YOU ARE SUMMONED and required to file an answer in this case, or otherwise file your appearance in the office of the clerk of this court (located in the Richard J. Daley Center, Room *801, Chicago, Illinois 60602), within 30 days after service of this summons, not counting the day of service. IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF ASKED IN THE COMPLAINT, A COPY OF WHICH IS HERETO ATTACHED.

To the officer:

  This summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this summons shall be returned so endorsed. This summons may not be served later than 30 days after its date.

WITNESS.................... MAR 04 2008

.....................................................
       Clerk of Court DOROTHY BROWN
        CLERK OF CIRC...

Date of service:........................20....
(To be inserted by officer on copy left with
Defendant or other person)

| | |
|---|---|
| Name | Nicholas A. Caputo |
| | GLOOR LAW GROUP, LLC |
| Attorney for | Plaintiff |
| Address | 225 W. Wacker Drive - Suite 1700 |
| City | Chicago, IL  60606 |
| Telephone | (312) 752-3700 |
| Atty No. | 42472 |

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY**

*Law Division Room 801
Chancery-Divorce Division Room 802
County Division Room 801
Probate Division Room 1202
#6838924

# EXHIBIT B

CERTIFICATION OF VITAL RECORD

| DECEDENT'S BIRTH NO. | REGISTRATION DISTRICT NO. **16.0** | STATE OF ILLINOIS | STATE FILE NUMBER |
|---|---|---|---|
| | REGISTERED NUMBER | **MEDICAL CERTIFICATE OF DEATH** | |

**Type or Print in PERMANENT INK See Funeral Directors, Hospital, or Physicians Handbook for INSTRUCTIONS**

| DECEASED–NAME FIRST MIDDLE LAST | SEX | DATE OF DEATH (MONTH, DAY, YEAR) |
|---|---|---|
| 1. Noah A Tuley Sr | 2. Male | 3. February 18, 2006 |

**A . . . . . . . . . . . DECEASED**

| COUNTY OF DEATH 4. Cook | AGE–LAST BIRTHDAY (YRS) 5a. 76 | UNDER 1 YEAR MOS. DAYS 5b. | UNDER 1 DAY HOURS MIN. 5c. | DATE OF BIRTH (MONTH, DAY, YEAR) 6d. August 23, 1929 |
|---|---|---|---|---|

| CITY, TOWN, TWP, OR ROAD DISTRICT NUMBER 6a. Lyons Township | HOSPITAL OR OTHER INSTITUTION–NAME (IF NOT IN EITHER, GIVE STREET AND NUMBER) 6b. RML Hospital | IF HOSP., OR INST., INDICATE D.O.A., OP/EMER., ER, INPATIENT (SPECIFY) 6c. Inpatient |
|---|---|---|

| BIRTHPLACE (CITY AND STATE OR FOREIGN COUNTRY) 7. Indiana | MARRIED, NEVER MARRIED, WIDOWED, DIVORCED (SPECIFY) 8a. Married | NAME OF SURVIVING SPOUSE (MAIDEN NAME, IF WIFE) 8b. Dorothy Spakowski | WAS DECEASED EVER IN ARMED FORCES? (YES/NO) 9. No |
|---|---|---|---|

**B . . . . . . . . . .**
**C . . . . . . . . . .**

| SOCIAL SECURITY NUMBER 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 | USUAL OCCUPATION 11a. Maint. | KIND OF BUSINESS OR INDUSTRY 11b. Tile Co | EDUCATION (SPECIFY ONLY HIGHEST GRADE COMPLETED) Elementary/Secondary (0-12) College (1-4 or 5+) 12. |
|---|---|---|---|

**D . . . . . . . . . .**
**E . . . . . . . . . .**

| RESIDENCE (STREET AND NUMBER) 14229 Cleveland | CITY, TOWN, TWP, OR ROAD DISTRICT NO. 13b. Posen | INSIDE CITY (YES/NO) 13c. Yes | COUNTY Cook |
|---|---|---|---|

| STATE 13. Il. | ZIP CODE 60469 | RACE (WHITE, BLACK, AMERICAN INDIAN, ETC.) (SPECIFY) 14a. White | OF HISPANIC ORIGIN? (SPECIFY NO OR YES–IF YES, SPECIFY CUBAN, MEXICAN, PUERTO RICAN, ETC.) 14b. X NO ☐ YES SPECIFY: |
|---|---|---|---|

**PARENTS**

| FATHER–NAME FIRST MIDDLE LAST 15. Arnold Tuley | MOTHER–NAME FIRST MIDDLE (MAIDEN) LAST 16. Hazel Crim |
|---|---|

**1 . . . . . . . . . .**
**2 . . . . . . . . . .**
**3 . . . . . . . . . .**

| INFORMANT'S NAME (TYPE OR PRINT) 17a. Dorothy Tuley | RELATIONSHIP Wife | MAILING ADDRESS (STREET AND NO. OR R.F.D., CITY OR TOWN, STATE, ZIP) 17b. 14229 Cleveland Posen, Il. |
|---|---|---|

**CAUSE**

18. PART I. Enter the diseases, or complications that caused the death. Do not enter the mode of dying, such as cardiac or respiratory arrest, shock, or heart failure. List only one cause on each line.

| | APPROXIMATE INTERVAL BETWEEN ONSET AND DEATH |
|---|---|
| Immediate Cause (Final disease or condition resulting in death) (a) Respiratory Failure | 8/18/ |
| CONDITIONS, IF ANY WHICH GIVE RISE TO IMMEDIATE CAUSE (a) STATING THE UNDERLYING CAUSE LAST. DUE TO OR AS A CONSEQUENCE OF (b) Coronary Artery Disease | |
| DUE TO OR AS A CONSEQUENCE OF (c) | |

**4 . . . . . . . . . .**
**5 . . . . . . . . . .**
**N . . . . . . . . . .**
**P . . . . . . . . . .**

| PART II. Other significant conditions contributing to death but not resulting in the underlying cause given in PART I Chronic Obstructive Pulmonary Disease Renal Failure | AUTOPSY (YES/NO) 19a. | WERE AUTOPSY FINDINGS AVAILABLE PRIOR TO COMPLETION OF CAUSE OF DEATH? (YES/NO) 19b. |
|---|---|---|

| DATE OF OPERATION, IF ANY 20a. | MAJOR FINDINGS OF OPERATION 20b. | IF FEMALE, WAS THERE A PREGNANCY IN PAST THREE MONTHS? 20c. YES ☐ NO ☐ |
|---|---|---|

**CERTIFIER**

| I (DID) (DID NOT) ATTEND THE DECEASED AND LAST SAW HIM/HER ALIVE ON 21a. 2-17-06 | WAS CORONER OR MEDICAL EXAMINER NOTIFIED? (YES/NO) 21b. No | HOUR OF DEATH 21c. 2:40 A.M. M. |
|---|---|---|

| TO THE BEST OF MY KNOWLEDGE, DEATH OCCURRED AT THE TIME, DATE AND PLACE AND DUE TO THE CAUSE(S) STATED. 22a. SIGNATURE ▶ | DATE SIGNED (MONTH, DAY, YEAR) 22b. 2-18-06 |
|---|---|

| NAME AND ADDRESS OF CERTIFIER (TYPE OR PRINT) 22c. Muhammad Nawazi m RML Specialty Hospital | ILLINOIS LICENSE NUMBER 22d. 036-102826 |
|---|---|

| NAME OF ATTENDING PHYSICIAN OTHER THAN CERTIFIER (TYPE OR PRINT) 23. Richard Petrak m | NOTE: IF AN INJURY WAS INVOLVED IN THIS DEATH THE CORONER OR MEDICAL EXAMINER MUST BE NOTIFIED. |
|---|---|

**DISPOSITION**

| BURIAL, CREMATION, REMOVAL (SPECIFY) 24a. Cremation | CEMETERY OR CREMATORY–NAME 24b. Oakland Mem | LOCATION CITY OR TOWN STATE 24c. Dolton Il. | DATE (MONTH, DAY, YEAR) 24d. FEB 22 200 |
|---|---|---|---|

| FUNERAL HOME NAME 25a. ADDUCI-DUNCAN-ZIMNY | STREET AND NUMBER OR R.F.D. 14522 Western | CITY OR TOWN Posen | STATE Il. | ZIP 60469 |
|---|---|---|---|---|

| FUNERAL DIRECTOR'S SIGNATURE 25b. Alexander Anthony Adduci | FUNERAL DIRECTOR'S ILLINOIS LICENSE NUMBER 25c. 034-010971 |
|---|---|

| LOCAL REGISTRAR'S SIGNATURE 26a. David Orr | DATE FILED BY LOCAL REGISTRAR (MONTH, DAY, YEAR) 26b. FEB 21 2006 |
|---|---|

VR500 (Rev. 4/89)    Illinois Department of Public Health, Division of Vital Records

0269470



County of Cook
State of Illinois

### Office of County Clerk
### David Orr



David Orr
DAVID ORR    COUNTY CLERK

This copy is not valid unless displaying embossed seals of Cook County and County Clerk signature.

VOID WITHOUT WATERMARK OR IF ALTERED OR ERASED

JUDGE NORDBERG
MAGISTRATE JUDGE COLE

# EXHIBIT C

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DOROTHY TULEY, individually and as
Special Administrator of the Estate of Noah
Tuley, Deceased,

    Plaintiff,

v,

SMITHKLINE BEECHAM CORP., d/b/a
GLAXOSMITHKLINE, INC.,

    Defendant.

Case No.

### AFFIDAVIT OF JOSHUA E. JOHNSON

I, Joshua E. Johnson, Esq., state under the penalties of 28 U.S.C. § 1746 that the following is true and correct:

1.    I am an attorney with Pepper Hamilton LLP.  Pepper Hamilton LLP represents SmithKline Beecham Corporation d/b/a GlaxoSmithKline and I have personal knowledge of the domicile of GSK, and have personally reviewed same prior to making this affidavit.

2.    SmithKline Beecham Corporation d/b/a GlaxoSmithKline is a Pennsylvania corporation with its principal place of business in Pennsylvania.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 7, 2008,

Joshua E. Johnson